[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 98 
Richard Hanson sued New Technology Inc. ("NTI"); C.S. Chang; Belinda Brazelton; J.L. Ellison; and Alice S. Chang, alleging breach of contract, breach of implied covenant of good faith and fair dealing, defamation, fraud, intentional interference with contractual and/or business relations, and outrage. The trial court entered a summary judgment for the defendants on all claims. Hanson appeals the court's ruling as to all claims but the claim alleging outrage. We affirm.
NTI is an engineering and technical service organization, founded in response to recognized opportunities in aerospace and military programs; it is located in the Huntsville, Alabama, area. C.S. Chang is the president of NTI. Belinda Brazelton is its facility security officer. J.L. Ellison was a member of the management of NTI, and was the director of the program out of which Richard Hanson operated. Alice Chang is the wife of C.S. Chang, the president of NTI, and is also the administrative services manager for New Technology, Inc.
This case was filed after June 11, 1987; therefore, the applicable standard of review is the "substantial evidence" rule. Ala. Code 1975, § 12-21-12. "Substantial evidence" is defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). See, Stinson v. American SterilizerCo., 570 So.2d 618 (Ala. 1990).
Hanson began working for NTI in 1985. In 1990, NTI terminated his employment because of alleged security violations discovered during an investigation by the National Aeronautics and Space Administration ("NASA"). Although it is undisputed that Hanson had no written contract of employment, Hanson argues that NTI's three employee handbooks and its management manual created an employment contract upon which he could rely; he, therefore, bases his breach of contract claim "upon his retention of employment with NTI after the company's distribution [of], and his acceptance of, the offers contained in the third Employee Handbook and the Management Manual." Consequently, we must first address whether the employee handbook (specifically the third employee handbook), and the management manual could be found by a factfinder to create a contract of employment; and, if so, whether the factfinder could find that NTI breached that contract by terminating his employment without complying with the procedural safeguards set forth in the management manual.
In Stinson v. American Sterilizer Co., 570 So.2d 618, 621, (quoting from Hoffman-La Roche, Inc. v. Campbell,512 So.2d 725, 734-35 (Ala. 1987), this Court stated as follows:
 "In Hoffman-La Roche, [512 So.2d 725 (Ala. 1987)], this Court, recognizing that the language in a policy contained in an employee manual may become an offer to create a binding unilateral contract, enunciated a three-pronged test in order to determine whether a policy contained in a handbook constitutes an offer to create a binding contract between an employer and an employee:
 " 'First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration.'
". . . .
 ". . . Furthermore, the Court in Hoffman-La Roche, 512 So.2d at 734-35, noted the following: *Page 99 
 " '[T]o become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy. . . . Indeed, if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook.' "
(Emphasis added in Stinson.)
Clearly, in this case, the language in the handbooks and the management manual, taken in their entirety, do not constitute an offer of employment. Rather, the language in the handbooks, found on the first page of all three of the handbooks, expressly disclaims that a contract of employment is in any way created by any NTI document concerning the employer/employee relationship:
 "Statements in this document and other NTI documents concerning the employer/employee relationship shall in no way imply that a contract exists between employer and employee. Employment and compensation can be terminated with or without cause and with or without notice, at any time, at the option of either the employee or NTI. No representative of NTI other than the President has the authority to enter into any agreement for employment for any specified period of time or to make any agreement contrary to the foregoing."
(Emphasis added.) Although the management manual does not contain an express disclaimer, it is clearly an NTI document concerning the employer/employee relationship; and as stated above, NTI chose to state clearly and expressly in its handbooks that the policies contained in the handbooks and in any "other NTI documents concerning the employer/employee relationship" are not to be construed "as an offer for a unilateral contract." See Hoffman-La Roche, supra.
We note Hanson's argument as to the dissimilar functions of the handbook and the management manual. However, from Hanson's description of the documents — he says "[t]he employee handbooks are intended to summarily inform all employees of the conditions governing their employment with NTI [and the] Management Manual is intended to implement the handbooks and [to] provide exact procedures for use in daily operational situations at NTI" — and from our review of the documents themselves, we see that the complementary nature of the documents is clearly established. Therefore, based on this express disclaimer in the handbook, we hold that, as a matter of law, neither the handbooks nor the management manual could reasonably be construed to constitute a unilateral contract of employment modifying Hanson's employee-at-will status; neither the handbooks nor the management manual could be construed as constituting an enforceable contract of employment. Consequently, we affirm the summary judgment as to the breach of contract claim.
This Court has recognized and has noted that "the 'obligation of good faith' arises as part of the contract" and that " 'every contract does imply [an obligation] of good faith and fair dealing.' " Hoffman-La Roche, 512 So.2d at 738 (citations omitted.) In this case, because no contract of employment existed, Hanson's claim alleging a breach of good faith and fair dealing must fail. Therefore, we affirm the summary judgment as to the claim based on an alleged implied covenant.
Hanson also contends that the defendants defamed him by publishing false statements that imputed criminal conduct, dishonesty, undesirable professional characteristics, and unsubstantiated violations of security standards. He says these statements appeared in three separate documents: (1) a memorandum from Belinda Brazelton to J.L. Ellison; (2) a memorandum from J.L. Ellison to C.S. Chang; and (3) a memorandum from C.S. Chang to all NTI employees.
The individual defendants, all management level employees, contend that their memoranda are privileged and do not support a defamation claim.
Recognizing that on a review of this summary judgment we must view the evidence *Page 100 
in the light most favorable to Hanson, the nonmovant, the defendants, in their brief, while emphasizing their claim that none of the statements in the memoranda was false, say they "assume some falsity has been identified" so that "an analysis of the remaining elements of Hanson's claim of defamation" can proceed.
 "[I]n a defamation case involving a corporate defendant, the first question must be 'Was there a publication of the allegedly defamatory material?' This question is answered by using the McDaniel/Burney [v. Southern Railway Co., 276 Ala. 637, 165 So.2d 726] [(1964)] test, which we most recently restated in Dixon v. Economy Co., 477 So.2d 353, 354 (Ala. 1985):
 " 'Communications among the managerial personnel of a corporation about the company's business do not constitute a publication, under the rule of McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343 (1947) [a case in which the Court stated that "where a letter is dictated by a corporate employee to a fellow corporate employee in the course of transacting the corporation's business and in the line of their duty as employees of the corporation and the letter is sent to another fellow corporate employee and it is in respect to the employee's relations with the corporation, there is not sufficient publication to sustain an action for libel"].' "
K-Mart Corp. v. Pendergrass, 494 So.2d 600, 603 (Ala. 1986). Thus, the first question for our review is whether the memoranda were published.
As to the memorandum from Brenda Brazelton to Jim Ellison, Hanson does not argue that memorandum was not a communication among management personnel of the same corporation or that it did not concern NTI business. Rather, Hanson contends that Brazelton was acting outside the line and scope of her employment in preparing the memorandum, because, according to Hanson, Brazelton was not responsible, under the Standard Practice Procedure, for determining the commission of illegal acts, for altering NASA findings, or for suggesting or requesting disciplinary action.
Pursuant to the Standard Practice Procedure, which stresses the importance of security to NTI's business, Brazelton, as the facility security officer for NTI, was responsible for "supervis[ing] and direct[ing] security measures necessary for the proper application of U.S. Government furnished guidance or specifications for classification, downgrading, upgrading, and safeguarding classified information" (1.2) and was required to report on various security matters as they related to classified information (1.2.5). Therefore, she was responsible for knowing whether NTI employees had breached security regulations and for determining the severity of the breaches, as well as being responsible for knowing the employment status of all NTI employees with security clearances. Having those responsibilities, Brazelton clearly was not acting outside the line and scope of her employment when she prepared the memorandum at issue at the request of her supervisor, Jim Ellison, who, in his words, had "asked Ms. Brazelton, based on her knowledge of the investigation . . ., to provide [him] with a report of exact violations against applicable procedures." Therefore, there was no publication under theMcDaniel/Burney rule; and Hanson cannot, therefore, predicate a claim of defamation on that memorandum.
Hanson bases his second claim of defamation on the memorandum from Jim Ellison (who was a management level employee; the director of the program out of which Hanson operated; and, according to Hanson, his immediate supervisor) to C.S. Chang (the president of the company). This communication, between a management level employee/director of operations/immediate supervisor and the NTI president concerning information about alleged NTI security violations, even if it contained false information, was not a publication under theMcDaniel/Burney rule.
Third, Hanson contends that C.S. Chang's memorandum toall NTI employees constitutes defamation. He contends *Page 101 
that only those NTI employees directly affected by security procedures had any need to know the nature and type of the alleged security violations; that the information was not relevant to those employees not cleared for handling classified documents; and that "[t]he extent and particularization of [Chang's] statement was unnecessary, overly broad, outside the line and scope of his authority, and malicious."
Although the memorandum from Chang was given to all employees and not just managerial employees, this Court, in Nelson v.Lapeyrouse Grain Corp., 534 So.2d 1085, 1093 (Ala. 1988), held that "[a]s long as a communication to a non-managerial employee falls within the proper scope of that employee's knowledge or duties, the McDaniel/Burney rule applies to non-managerial employees as well as to managerial employees." See, Atkins FordSales, Inc. v. Royster, 560 So.2d 197 (Ala. 1990).
In this case, knowledge of security regulation and adherence thereto are vital requirements for all NTI employees. A review of the provisions in the handbook concerning "security" establishes that those provisions are not limited to employees who handle classified information, but apply to all NTI employees. Because Chang's memorandum served as a reminder to all employees of the serious nature of security violations, it fell within the proper scope of all NTI employees' knowledge and duties and within the McDaniel/Burney "no publication" rule.
Based on the foregoing, we affirm the summary judgment as to the defamation claim.
Hanson bases his fraud claim on alleged representations made in "the form of conditions governing his employment and the procedures in effect to ensure fair and just treatment in disciplinary or termination proceedings." Hanson claims that when NTI took disciplinary action against him, it did not conduct the action in an objective and constructive manner (i.e., that it did not allow him an opportunity to be heard; did not hold a factfinding session to ascertain whether a violation had occurred; and did not give him an opportunity to appeal the disciplinary action). He also claims that NTI did not follow any of the procedures mandated by the management manual in terminating his employment (i.e., that he was foreclosed from providing input into the investigation against him; that he was not allowed a hearing with his manager to determine whether a resolution could be made; and that no one reviewed the situation and discussed the matter with him). Hanson alleges that the management manual to which he often referred "in the course of performing his employment duties" and "three handbooks provided by NTI, through its agent C.S. Chang, constitute a pattern of often repeated assurances that [he] would have job security through the present existence of certain stated safeguards which were meant to protect him in a disciplinary or termination action."
During Hanson's deposition testimony, when he was questioned about his fraud claim, he answered "yes" to the question whether "all of these misrepresentations . . . are based on what [he] read in the employee handbook," and he answered "no" to the question whether any other documents would evidence those representations other than the employee handbook.
According to NTI, Hanson subsequently changed his argument to include alleged representations made in the management manual and NTI argues that if Hanson considered anything in the management manual to constitute a misrepresentation, he should have said so when directly asked that question at his deposition, under oath. NTI also points out that neither Hanson's complaint nor his deposition testimony mentions the management manual in referring to the fraud claim. Rather, NTI contends that Hanson attempted to include alleged representations in the management manual as part of his fraud claim by filing an affidavit subsequent to Chang's deposition, at the taking of which the management manual had been produced, and by arguing in his brief on appeal that there were misrepresentations in the management manual.
In response, Hanson argues that he had requested production of the management *Page 102 
manual prior to his deposition, but that it had not been produced.
In Lady Corinne Trawlers v. Zurich Ins. Co., 507 So.2d 915
(Ala. 1987), this Court held that a party cannot be allowed to directly contradict his prior sworn testimony just to create an issue of fact in an attempt to avoid a summary judgment. See, also, e.g., Faith, Hope Love, Inc. v. First Alabama Bank ofTalledega County, N.A., 496 So.2d 708 (Ala. 1986).
After a thorough review of the record, which contains no request for production of the management manual and noting that the complaint and the amended complaint are silent as to any alleged misrepresentations in the management manual, we hold that Hanson cannot be allowed to directly contradict his deposition testimony by a subsequent affidavit or by argument in his brief in an attempt to create an issue of fact to avoid having a summary judgment entered against him on his fraud claim. Therefore, for purposes of that claim, we will look only to his allegation of misrepresentations made in the handbooks.
According to Hanson, one of the misrepresentations in the handbooks is as follows: "Disciplinary actions are administered in an objective, constructive manner. . . ."
That provision, in its entirety, reads as follows:
 "Disciplinary actions are administered in an objective, constructive manner and, with the exception of termination, are intended to motivate employees toward proper conduct in the future. An employee is terminated when disciplinary measures have failed or the severity and circumstances of the violation make continued employment unacceptable."
The portion of the above-quoted provision that Hanson alleges constitutes a misrepresentation, whether read alone or within the context of the entire provision, is a vague, general statement; it is not a representation sufficient to sustain a fraud claim. See, e.g., Ellis v. City of Birmingham,576 So.2d 156 (Ala. 1991).
The second provision Hanson cites in support of his fraud claim states that an employee will not be discharged without an opportunity to be heard. That provision, which was found in the first handbook, was not in effect when Hanson's employment was terminated and therefore could not represent NTI's policy at that time.
Based on the foregoing, we affirm the summary judgment as to Hanson's fraud claim.
Hanson also claims that Belinda Brazelton intentionally interfered with his business relationship with NTI by "implicating [him] in the alleged security violations far beyond the scope envisioned by the NASA investigation report which interference caused termination proceedings that were unsupported by the findings of NASA's investigation."
In Perlman v. Shurett, 567 So.2d 1296, 1297 (Ala. 1990), this Court stated in part as follows:
 " '[C]orporate officers or employees may individually commit the tort of intentional interference with business or contractual relations to which their corporation or employer is a party. . . . However, courts have held that this tort cannot be maintained against officers or employees of a corporation unless those persons were acting outside their scope of employment and were acting with actual malice. . . .' "
Quoting Hickman v. Winston County Hospital Board,508 So.2d 237, 239 (Ala. 1987). (Emphasis added.) (Citations omitted.) Furthermore, in Perlman v. Shurett, 567 So.2d at 1298-99, this Court held as follows, quoting Justice Adams's special concurrence in Hickman, 508 So.2d at 241:
 " 'In interpreting the impact of the newly defined tort in the employee-employer context, we do require that the plaintiff show malice, whereas in the ordinary case only intentional conduct is required. Furthermore, in order to show malice the plaintiff must make a strong showing of a pattern of interference. This is more than an isolated incident of the officer or employee's acting outside his scope of employment. To establish a *Page 103 
prima facie case of this kind, the plaintiff must meet the four requirements enumerated in [Gross v. Lowder Realty Better Homes Gardens, 494 So.2d 590 (Ala. 1986), and Lowder Realty, Inc. v. Odom, 495 So.2d 23 (Ala. 1986)], and must show that the defendants acted outside their scope of employment and did so maliciously.' "
(Emphasis added.)
In this case, from our review of the record, we conclude not only that Hanson failed to establish that Brazelton was acting outside the scope of her authority in drafting the memorandum, but also that Hanson failed to establish that Brazelton's actions were taken maliciously. More specifically, he failed to make the requisite showing of a pattern of interference. Therefore, we affirm the summary judgment as to the intentional interference claim.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES and KENNEDY, JJ., concur.