Leon and Connie Mooney appeal from a summary judgment in favor of Harco Drug, Inc., and Jimmy Harrison, Jr., president of Harco, on the Mooneys' claims of breach of employment contract and fraud. We affirm.
In October 1989, Harco Drug, Inc., purchased eight Super-X Drug stores. Leon Mooney was the manager of the Super-X store at Oxford Mall in Oxford, Alabama, which was one of the eight stores purchased by Harco. His wife Connie Mooney was a part-time pharmacist technician at the same location. Prior to the purchase, Jimmy Harrison met with the Super-X managers of the eight stores and spoke with them regarding new management.[1] According to the Mooneys, Harrison represented to the managers that they would retain their former positions after Harco's acquisition and that Harco would recognize the benefits that the employees had been receiving from Super-X, with the exception that there would be a cut in vacation time. At that meeting, the Mooneys contend, Mr. Harrison represented to the managers that the employees would be terminated only because of dishonesty or rudeness to a customer. They acknowledge, however, that they were told that some "expense cuts" might have to be made in January, and they admit that they did not inquire further into the meaning of the statements regarding expense cuts. They also stated that at the meeting Harrison informed the managers that the stores would be receiving additional inventory and that an advertising campaign would be launched for the Christmas season. The managers were then given copies of the Harco employee handbook. *Page 236 
According to Harco, the Oxford Mall store's sales for 1989 decreased by 18% from the previous year, despite the fact that it received much inventory. When considering ways to cut expenses at the Oxford store, Harco noted that Leon Mooney held the highest paid manager's position of all the Harco stores, with a salary-to-sales percentage of 14%, which was 2% higher than Harco management liked for its stores. In addition, Connie Mooney was the highest paid part-time employee in all the Harco stores. Harrison stated in his affidavit that following the Christmas season the figures for the Harco stores were examined and it was thereafter determined that Leon Mooney and Connie Mooney should be terminated for economic reasons. Considering their high salaries, in light of the fact that Leon Mooney had been rated for Harco by his former employer with a "C minus" on job performance and Connie Mooney had received a "C" rating,[2] the Mooneys' employment was terminated. Harco contends that both positions were eliminated and that the positions of pharmacist and manager were combined at the Oxford store. Connie Mooney's position was eliminated altogether. Leon Mooney was given six weeks' severance pay.
 "[T]his Court has held that an employment-at-will relationship can be modified by provisions in an employee handbook by which the employer promises not to discharge employees except by procedures or for causes set forth in the handbook:
 " '[T]he language contained in a handbook can be sufficient to constitute an offer to create a binding unilateral contract. The existence of such a contract is determined by applying the following analysis to the facts of each case: First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration.'
 "Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725, 735 (Ala. 1987).
 "To satisfy the first requirement in the Hoffman-La Roche analysis, 'the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy.' Hoffman-La Roche, 512 So.2d at 734. Whether the language in the handbook was intended to be an offer is determined by reference to the reasonable meaning of the parties' external and objective manifestations, rather than by their uncommunicated beliefs. Mayo v. Andress, 373 So.2d 620, 623-24 (Ala. 1979)."
Bell v. South Central Bell, 564 So.2d 46, 48 (Ala. 1990).
The Mooneys contend that the handbook given to them by Harco created an implied employment contract and that they could not be terminated without cause. We disagree. We have read the entire employee manual and we conclude that, at best, it gives an optimistic view of employment with Harco. Although the Harco handbook did not contain an express provision indicating that it was not to be considered a contract (as did the document in our recent case of Hanson v. New Technology, Inc., 594 So.2d 96
(Ala. 1992)), none of the language contained therein, however, is specific enough to be construed as creating a contract with Harco employees. The handbook, in pertinent part, states:
 "This booklet is designed to let you know about your day to day work requirements, to know what Harco expects from you and what you can expect from Harco.
 "It would be beneficial to you if you would read this book carefully and completely. If you find there are additional questions that you need answers to *Page 237 
please don't hesitate to ask your manager.
". . . .
 "We want you to feel that Harco is your company. We strive to attract talented, dedicated people and to offer to them the opportunities they want in regard to benefits, salary, promotional opportunities and job security.
 "We ask in return that you take your job seriously and apply your full effort, talent and concern for the job.
 "At Harco we want to provide as many elements of a good job as possible in order to encourage loyalty and support from our employees.
". . . .
 "At Harco we have tried to keep rules and regulations to a minimum as we try to encourage creativity, suggestions and have a quality motivated labor force that gets the job done without a lot of regulations. It is, however, necessary to have some rules to keep things running smoothly for everyone.
 "The person who tends to 'play his own game,' disregarding those who work with him, is likely to trespass on the rights of another individual.
 "In general, disciplinary action cases fall into two broad categories of offenses: Group I or Group II. This is a general framework. Individual cases are evaluated on their own circumstances with appropriate counseling and discussion being a vital part of the final outcome.
 "The lists below are not intended to be all inclusive, but it is typical of some disciplinary infractions and degrees of severity.
 "Group I — In most cases the acts in group I would result in a written warning with a probationary period being established in order that the employee be given time to correct the situation. Even in these instances however, depending on the seriousness, an employee could be discharged.
 "1 Willfully defacing or damaging property belonging to the company or fellow employees.
"2 Excessive tardiness or absence
"3 Unexcused absence
"4 Unsatisfactory job performance
 "5 Refusal to follow company policy or directions provided by authorized management personnel.
 "Group II — Any actions by an employee relative to the following can result in immediate termination:
 "1 Stealing money or property from the company or a fellow employee
 "2 Reporting for work or working under the influence of alcohol or narcotics
 "3 Using alcohol or narcotics on company property.
"4 Falsifying application, time records, etc.
"5 If you deliberately slow or stop work
"6 Gambling on company property
"7 Sleeping on the job.
 "8 Conviction of a felony committed on or off company property
 "9 Committing immoral or indecent acts on company property.
"10 Fighting on the job."
Nowhere in the manual is there any specific procedure for terminating an employee, and the statement of disciplinary offenses that could result in termination indicates that the list is not intended to be all inclusive. There is simply no feasible way that the Harco handbook could be interpreted as a contract for employment for an indefinite time, subject only to termination for cause. Nowhere does the handbook even imply that the disciplinary offenses comprise the only ways in which an employee of Harco can lose his job. The handbook itself is too general and merely purports to answer questions that Harco employees might have about their employment.
 "Of course, to become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy. See Pine River [State Bank v. Mettille, 333 N.W.2d 622
(Minn. 1983)]."
Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725, 734
(Ala. 1987). *Page 238 
 "An employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer."
Id., at 731. The employee handbook in this case contains no section dealing with termination or the process of termination, as did the handbook in Hoffman-La Roche. The Hoffman-La Roche
handbook stated specifically:
 "If Roche has to terminate your employment, you will be given a printed explanation of the termination process (Termination Procedure Forms). The material summarizes the status of your benefits, but you should also look at your printed benefit materials for further information.
 "(This paragraph does not apply to field sales personnel.) Before you terminate you will be asked to have a physical examination at Employee Health Services and to obtain clearance signatures indicating that you have returned your identification badge and completed any other duties related to ending association with your department. You will also be asked to have a final interview with the Personnel Department. That department will review all termination procedures with you to make sure you understand and comply with them.
 "As part of the process, the Payroll Department and the HLR Credit Union will determine whether any money is owed you or whether you owe any money. Arrangements will be made for repayment.
 "You will be paid for all time worked through your last day."
". . . .
 "There are five types of termination. "Retirement under the Retirement Plan: When you retire you will receive a pension from Roche. You'll be given a booklet explaining all of the benefits that are available to you through Roche.
 "Resignation: If you voluntarily leave the company you must give at least two weeks' notice so that your supervisor can arrange for transition of work and/or fill your position.
 "Layoff: Circumstances such as lack of work may force the company to terminate you subject to recall. If you are recalled within a year of the date of layoff, you will be reinstated without loss of seniority.
 "Discharge for Performance: The company will discharge an employee who is considered unable to meet the requirements of his or her job. This person is not eligible for recall or reinstatement.
 "Disciplinary Discharge: The company can terminate employment on the grounds of misconduct or willful negligence. In such cases, an employee will not be considered for reemployment."
This Court wrote in Hoffman-La Roche:
 "The language used in this handbook is clear enough that an employee reading it could reasonably believe that, as long as he worked within the guidelines set out in the handbook, he would not be terminated until all procedures set out in the handbook had been followed, including the reasons and circumstances for termination in the handbook."
Id., at 736-37. (Footnotes omitted.) Such specificity is not found in the Harco handbook and, therefore, the trial court did not err in entering the summary judgment in favor of Harco.
AFFIRMED.
HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.
[1] Although Connie Mooney was not a manager, she did attend the managers' meeting
[2] These were the lowest ratings given to any Super-X employees in the newly acquired stores.