Sammy Campisi sued Scoles Cadillac, Inc., alleging breach of an employment contract and fraud. The trial court entered a summary judgment for Scoles Cadillac. Campisi appeals.[1] We affirm.
Viewing the evidence in the light most favorable to Campisi, the nonmoving party, as we are required to do under the applicable standard of review, we must assume that the following occurred:
From June 1987 until February or March 1988, Campisi worked as a general service adviser/service writer for Scoles Cadillac. He then became manager of the body shop, where he remained until June 1988, when he was transferred to service director. As service director, he was responsible for the operations of the service department, the parts department, and the body shop, and he was to "attempt to make [the service department] more profitable and to keep customer satisfaction at an acceptable level." One year later, according to Gary Ivey, Scoles's general manager, the service department was not improving under Campisi's guidance. However, because Scoles wanted to retain Campisi as an employee, it offered him a transfer to sales, explaining that it thought he was better suited as a *Page 298 
salesman and that he had the potential to earn more income in that position. Following notice of the proposed transfer, Campisi told Scoles that he was "not selling cars for Scoles Cadillac" and "got [his] things and left."[2]
Campisi sued Scoles, alleging that the employee application, the employee handbook, and the personnel policy manual[3] issued him by Scoles created an employment contract and that he was wrongfully terminated under the contract — that the application, the handbook, and the manual contained statements which, when viewed individually or in the aggregate, constituted an employment contract, so that he was "no longer an employee-at-will and was [therefore] subject to discharge only for cause." Campisi also alleged that the representations made by Scoles in the application and the handbook were fraudulent.
Scoles maintains that the documents at issue did not create a contract of employment but that Campisi was at all times an employee-at-will; that his duties were terminable or changeable at will; and that he quit his employ voluntarily rather than accept another position with the company. According to Scoles, the application contained a general statement of policy referring to a specified probationary period, but did not create a contract of permanent employment upon expiration of that period; the handbook was an informational statement of self-imposed policies, providing a "non-exclusive" list of acts couched in general terms, open to broad discretion and interpretation, and subject to change, for which an employee might be terminated; and the manual, although not applicable to management personnel, such as Campisi, simply contained "recommendations" of disciplines, the course of which might vary according to individual circumstances. Scoles also maintains that neither the application nor the handbook contained representations giving Campisi a cause of action for fraud.
It is well settled that a contract of employment-at-will may be terminated by either party with or without cause or justification, but the employment-at-will relationship can be modified by provisions in an employee handbook by which an employer promises not to discharge an employee except by specified procedures or for specified causes. See Bell v. SouthCentral Bell, 564 So.2d 46, 48 (Ala. 1990). In Hoffman-LaRocheInc. v. Campbell, 512 So.2d 725, 734-35 (Ala. 1987), having recognized that certain language contained in an employee handbook may become an offer to create a unilateral contract, this Court set forth the following test by which to determine whether the handbook creates a binding contract of employment:
 "[T]o become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy. . . . Indeed, if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook. . . .
". . . .
 ". . . First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration."
See, also Stinson v. American Sterilizer Co., 570 So.2d 618
(Ala. 1990). Whether an employee handbook meets this test is a matter of law to be determined by the *Page 299 
court. See Hoffman-LaRoche, supra; Stinson v. AmericanSterilizer Co., supra.
When first employed by Scoles, Campisi signed an application, which stated in part:
 I further acknowledge that if I am hired by [Scoles] my employment status will be that of a probationary employee for a period of ninety (90) days commencing with the first day of my employment. Further, I understand and acknowledge that in said probationary employment status, I will be subject to layoff, dismissal, or discharge for any reason at the sole and complete discretion of dealership management and I hereby waive any right I may have to challenge any layoff, dismissal or discharge to any local, state or federal agency or court."
(Emphasis added.)
According to Campisi, the above-quoted language pertaining to the 90-day probationary period constituted an offer of continuous employment, absent just cause, after expiration of that 90-day period. We disagree. This provision does not meet the requirement in Hoffman-LaRoche, supra, that the language used be definite in form and specific enough to constitute an actual offer rather than a mere general statement of policy — it creates no right to continued employment; it does not impose restrictions on Scoles's ability to change Campisi's duties or assignments; and the expiration of the specified probationary period does not affect Campisi's status as an at-will employee absent specific language indicating otherwise.
Campisi also received a handbook, specifically stating that it was written "to serve as a guide for each of us at Scoles Cadillac . . . [outlining] what you may expect and what is expected of you," and setting forth the mutual obligations of the employer and the employee. The handbook discussed annual evaluations, employee benefits, employee paychecks, and employee responsibilities. In the section of the handbook titled "YOUR JOB," under the heading "TRIAL PERIOD," the following appeared:
 Being chosen to join Scoles Cadillac is like being recruited by a professional football team. First, you have to make the team and that's not easy. After that, as in pro ball, how well you do your job will determine how you will be measured and rewarded. Your first [90] days of employment are considered a trial period, during which [Scoles] evaluate[s] your attitude, and your willingness to learn and correctly perform your new duties. New employees are given every opportunity to prove their abilities during the 90-day trial period."
(Emphasis added.) Within the section of the handbook entitled "YOUR RESPONSIBILITIES," under the heading "RULES OF CONDUCT," Scoles specifically delineated 21 offenses that could serve as the basis for "immediate" dismissal, stating:
 "The violation of any rules and regulations contained herein, including but not limited to the following [21 offenses], are grounds for dismissal."
(Emphasis added.) Immediately following the list of 21 offenses, Scoles included the following statement:
 "Any of the above [21 offenses] are causes for immediate termination of employment without warning! There are other activities that can lead to termination."
(Emphasis added.)
Having considered the above-quoted language in the handbook, we hold that there was no specific promise or offer made by Scoles in the handbook that could be characterized as a promise not to dismiss without just cause or without exhausting specified procedures. Rather, the specific language of the handbook lists certain inappropriate behavior that is not all-inclusive and that reserves Scoles's right to deviate from that list — the language in the handbook constitutes general guidelines for discharge and termination but does not contractually limit the manner and procedure by which the employer could discharge an employee. Furthermore, the list of employee benefits in the handbook that Campisi maintains was "specific and comprehensive" enough to constitute a specific offer of employment is nothing more than a statement of general policy, which is insufficient *Page 300 
to create an offer for continued employment.
In the manual that Campisi received, under the "TRIAL PERIOD" section, the following language appeared:
 "An informal 90-day trial period allows both the new hire and Scoles Cadillac an examination period. This is the most critical period in the career of the new person and Scoles Cadillac.
 "If at the end of the 90-day period we find that longer term arrangements are appropriate, then they can be made. If an employee is separated during the 90-day period, he is not due any notice or any benefits."
(Emphasis added.) Under the "RULES AND RECOMMENDED DISCIPLINE" section of the manual, Scoles listed 28 circumstances for which specified "recommended" discipline was indicated, which list was followed by this statement:
 "Individual circumstances may dictate varying courses of action, the important thing is to be fair and even-handed."
(Emphasis added.) Because the above-quoted language specifically indicates the nonexclusive, changeable nature of the individual circumstances for which discipline is recommended, we hold that the manual does not constitute an offer of continued employment.
Based on the foregoing, we hold that the provisions in the application, the handbook, and the manual, when taken individually or in their entirety, are not specific enough to constitute an actual offer of employment; they do not constitute an enforceable contract of employment, but merely constitute general, informational statements of policy, providing nonexclusive lists of acts for which an employee may be terminated.
As to Campisi's fraud claim, suffice it to say that from a review of the record and the briefs of the parties, we find it clear that the alleged misrepresentations concern future acts. Therefore, to defeat Scoles's properly supported motion for summary judgment, Campisi not only must present substantial evidence of the basic elements of fraudulent misrepresentation, Ala. Code 1975, § 6-5-101, but he also must present substantial evidence that Scoles intended, at the time of the representation, not to perform, and that Scoles made the representation with the present intent to deceive. Watters v.Lawrence County, 551 So.2d 1011 (Ala. 1989).
After a careful review of the record, this Court can find no evidence to support Campisi's allegation that when Scoles made the alleged representations, through the application, the handbook, and/or the manual, it lacked a present intent to perform the promised act and intended to deceive Campisi. The evidence merely establishes that the application, the handbook, and the manual contained general statements of policy, not representations sufficient to sustain a fraud claim.
AFFIRMED.
HORNSBY, C.J., and MADDOX, KENNEDY and INGRAM, JJ., concur.
[1] This case was filed after June 11, 1987; therefore, the applicable standard of review is the "substantial evidence rule." See Ala. Code 1975, § 12-21-12; West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870 (Ala. 1989).
[2] Campisi is now a salesman for another automobile dealership.
[3] We note Scoles' argument that Campisi's reliance on the manual to support his allegations that he had a contract with Scoles and to prove fraud was first presented on appeal and is therefore not properly before us for review. However, the record is replete with references to the manual; therefore, those portions of the manual referred to in the trial court are properly before us for consideration.