The petitioner, Pamela Graham, was discharged from her employment with the Community Action Agency of North Central Alabama, Inc. ("the Agency"). Graham sued the Agency; its executive director, Thomas M. Wood III; and two other employees, Sue Murphy and Linda Vest, alleging breach of an employment contract, slander, and the tort of outrage. The slander claim was dismissed on the joint stipulation of the parties.
Following oral argument and the submission of briefs and supporting documents, the trial court entered a summary judgment in favor of the defendants. As to the breach of contract claims, it held that Graham was an employee at will and that the Agency's Manual did not "rise to the level of an employment contract sufficient to abrogate the 'at-will' nature of her employment." The trial court held that the conduct of the defendants, while "in bad taste and insulting and not the kind of conduct to be recommended in dealing with employees," did not rise to the level of conduct contemplated by American *Page 1216 Road Service Co. v. Inmon, 394 So.2d 361 (Ala. 1981), as "outrageous."
The Court of Civil Appeals affirmed the judgment, without opinion. Graham v. Community Action Agency of North CentralAlabama, Inc. (No. 2941320), 682 So.2d 517 (Ala.Civ.App. 1996) (table). This Court granted Graham's petition for the writ of certiorari to review her argument that the Court of Civil Appeals' decision conflicts with prior decisions of this Court on the question of when an employee handbook constitutes an employment contract.[1]
The employee handbook in issue here is the Agency's "Personnel Policies and Procedures Manual" ("the Manual"), pertinent excerpts of which provide:
 "These Personnel Policies and Procedures attempt to pull together certain laws, regulations, and policies governing the Agency.[2] Some items in this document are recommendations and others are Agency and legal requirements. . . . These Policies and Procedures have been carefully reviewed by the staff and Personnel Committee, who will continue to make policy changes as needed. This document, then, represents a continuing effort and not an end — a place from which we continue to work as our Agency seeks improvement."
 "The purpose of this Manual is to state specific policies of the Board of Directors through which the Agency and its employees may achieve understanding of their responsibilities and obligations to each other. . . .
 "Further, it is recognized that no policy statement can cover every situation arising; therefore, matters not covered are subject to the approval of the Personnel Committee within the [purview] of its assignment by the Agency's Board of Directors."
 "The Executive Director . . . retains the responsibility and the right to hire, evaluate staff performance, promote, transfer, assign, retain employees in positions, suspend, demote, discharge or take disciplinary action against employees if a just cause exists; to relieve employees from duties because of a lack of work or for other legitimate reason."
 "Current Personnel Policies and Procedures will be issued to each employee. . . . Approved revisions [of the personnel policies] in completed Manual format will be reproduced and copies will be distributed to all Agency employees along with a 'Manual Revision Transmittal Memo' providing instructions for removing outdated pages from the Manual and inserting the attached revised pages.
". . . .
 "Current Personnel Policies and Procedures will be issued to each employee. As each employee receives these Policies, he/she will be required to sign a receipt which will become a part of his/her personnel file."
 "Employees of the Agency will fall into one of five classes:
 "1. Full-Time Employee: An employee who works a full-time normal work week of forty (40) hours and whose position is considered to be of a permanent nature; or an employee who works less than . . . forty (40) hours, hired on a permanent basis.
 "2. Probationary Employee: An employee, either full or part-time, who has not completed the probationary employment period [of] ninety (90) days. . . .
 "3. Permanent Employee: An employee hired on a full-time basis who has served a satisfactory probationary period. *Page 1217 
"4. Temporary Employee: . . . .
"5. Volunteer Employee: . . . ."
 "The purpose of the probationary period is to provide a period during which a new employee's ability to function in a new position with the Agency can be evaluated. At any time during the ninety (90) days, the supervisor may recommend termination for cause."
"11.3 DISCIPLINARY ACTIONS
 "The following types of disciplinary action will be utilized in enforcing Agency work rules and standards of conduct, the specific type and degree of disciplinary action to be determined by the nature of the offense. In making judgments, one or more of the following actions may be taken and no order is established.
"11.3.1 CORRECTIVE INTERVIEW
 "When an employee has violated an Agency rule or regulation or for some other reason requires supervisory attention, the first step may take the form of a corrective interview . . . .
"11.3.2 PROBATION . . . .
"11.3.3 SUSPENSION WITH PAY . . . .
"11.3.4 SUSPENSION WITHOUT PAY. . . .
"11.3.5 INVOLUNTARY TERMINATION (DISMISSAL)
 "When circumstances so warrant, an employee may be involuntarily terminated (discharged, dismissed, fired).
 "Such action will be recommended by the employee's supervisor and approved by the Executive Director following careful consideration of all aspects of the specific case. In the case of a Head Start employee, the Head Start Policy Council has the responsibility for final approval or disapproval.
 "When an employee is terminated, a written notice of termination, which states the reason(s) for dismissal, will be signed by the employee's supervisor and the Executive Director. . . .
". . . .
 "Any employee involuntarily terminated will be
referred to the Grievance Procedures outlined in the Personnel Policies and Procedures Manual, which is in the possession of each employee."
(Emphasis added.)
Section XV of the Manual is entitled "Grievance Procedures," and it begins by stating that the purpose of "this policy is to provide a procedure for the prompt consideration and equitable disposition of formal grievances presented by individual employees of the Agency." Subsection 15.4, "Formal Grievance Procedures," contains this warning:
 "PLEASE READ THE FOLLOWING VERY CAREFULLY. ALL EMPLOYEES WHO HAVE AN ADVERSE ACTION INITIATED AGAINST THEM WILL HAVE ACCESS TO THE GRIEVANCE PROCEDURES AS OUTLINED."
Subsection 15.4 states that an employee is entitled to be represented by counsel during the grievance procedure and that the employee has the right to present witnesses on his or her behalf and to cross-examine witnesses called against him or her.
Subsection 15.4 then sets out the steps in the grievance procedure. As Step 1, the employee "will present" his or her grievance, in writing, to the immediate supervisor, who will arrange a meeting with the employee.
If Step 1 does not result in a settlement of the grievance, Step 2 requires a meeting with the Agency's executive director. The executive director "shall determine whether the action taken was arbitrary, capricious, discriminatory, or in violation of the articles of incorporation, by-laws, personnel policies, or other rules and regulations of the Agency."
If the employee is not satisfied with the executive director's decision, Step 3 allows the employee to take the grievance to the personnel committee (along with the Head Start personnel committee if the grievance involves a Head Start employee). The guidelines for the personnel committee's consideration of the grievance are identical to those noted above for the executive director, and the decision must be by majority vote.
Step 4 allows the employee or the executive director to appeal the decision of the personnel committee to the executive committee, *Page 1218 
which will be joined by the executive committee of the Head Start program if the grievance involves a Head Start employee. Again, the guidelines are to determine whether "the action taken was arbitrary, capricious, discriminatory, or in violation of the articles of incorporation, by-laws, personnel policies, or other rules and regulations of the Agency."
Step 5 is an appeal of the executive committee's decision to the Agency's board of directors (joined by the Head Start policy council if the grievance involves a Head Start employee). If the employee is not satisfied with the decision of the board of directors, "he/she may exercise the right to present the case before the appropriate administrative agency or before the appropriate State or Federal Courts."
"[I]n the appropriate case, language contained in an employee handbook can be sufficient to create a binding contract." Barksdale v. St. Clair County Commission,540 So.2d 1389, 1390 (Ala. 1989) (emphasis in original).
 "It is well settled that a contract of employment-at-will may be terminated by either party with or without cause or justification, but the employment-at-will relationship can be modified by provisions in an employee handbook by which an employer promises not to discharge an employee except by specified procedures or for specified causes. See Bell v. South Central Bell, 564 So.2d 46, 48 (Ala. 1990). In Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725, 734-35 (Ala. 1987), having recognized that certain language contained in an employee handbook may become an offer to create a unilateral contract, this Court set forth the following test by which to determine whether the handbook creates a binding contract of employment:
 " '[T]o become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy. . . . [I]f the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook. . . .
" '. . . .
 " '. . . First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration.'
 "See, also, Stinson v. American Sterilizer Co., 570 So.2d 618 (Ala. 1990)."
Campisi v. Scoles Cadillac, Inc., 611 So.2d 296, 298
(Ala. 1992).
In Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725
(Ala. 1987), this Court held that the employee handbook did create a unilateral offer of employment that had been accepted by the employee. The Hoffman-La Roche Court stated that the employer "limited its right to terminate [the employee] by its issuance of an employee handbook containing certain provisions specifying the only procedures by which an employee could be discharged." 512 So.2d at 727-28. The Court also held that the language in the Hoffman-La Roche handbook was "clear enough that an employee reading it could reasonably believe that, as long as he worked within the guidelines set out in the handbook, he would not be terminated until all procedures set out in the handbook had been followed." 512 So.2d at 736-37.
In Bell v. South Central Bell, 564 So.2d 46 (Ala. 1990), the Court held that the employment documents contained statements of policy and were too general to constitute an offer of employment. Thus, the Bell Court held, the documents did not reflect an intention on the part of the employer to offer a permanent employment contract.
In Stinson v. American Sterilizer Co., 570 So.2d 618
(Ala. 1990), the employee handbook contained an express disclaimer stating that "[b]ecause of the great variety of situations which may arise . . ., [the company] reserves the right to make decisions related to employment in a manner other than as provided in this handbook." 570 So.2d at 620. The handbook also provided that descriptions of employee misconduct given in the handbook *Page 1219 
were given merely as examples of when "progressive action techniques" would be appropriate. Id. The handbook did not provide for definite performance review, nor did it provide an employee grievance procedure.
The employee handbooks considered in the cases of Abney v.Baptist Medical Centers, 597 So.2d 682 (Ala. 1992); Clark v.America's First Credit Union, 585 So.2d 1367 (Ala. 1991); Hansonv. New Technology, Inc., 594 So.2d 96 (Ala. 1992); and Dykes v.Lane Trucking, Inc., 652 So.2d 248 (Ala. 1994), contained express disclaimers stating that "[a]ll employment is terminable with or without cause at the will of either the employee or the employer," Abney, 597 So.2d at 682;[3] that "this manual should not be construed to be a binding contract,"Clark, 585 So.2d at 1369; that "[s]tatements in this document . . . in no way imply that a contract exists," Hanson, 594 So.2d at 99; and that "[t]he policies described in this employee handbook are not conditions of employment and the language is not intended to create a contract between [the company] and its employees," and that "our employment 'at will' policy will remain in effect during the entire course of your employment,"Dykes, 652 So.2d at 249.
In Mooney v. Harco Drug, Inc., 611 So.2d 235 (Ala. 1992), the employee handbook was held not to be specific enough to "be interpreted as a contract for employment for an indefinite time." 611 So.2d at 237. The handbook contained no procedures for employee grievances, and it stated that a list of disciplinary offenses did not "comprise the only ways in which an employee can lose his job." 611 So.2d at 237.
In Campisi v. Scoles Cadillac, Inc., 611 So.2d 296
(Ala. 1992), the employee claimed that his employment application, the company's employee handbook, and the company's personnel policy manual created an employment contract that he had accepted. Therefore, argued the employee, he was wrongfully terminated, because, he argued, he was not an employee at will. This Court held that none of the three documents contained promises of employment, but that all three documents were merely "general, informational statements of [company] policy." 611 So.2d at 300.
In Paseur v. City of Huntsville, 642 So.2d 969 (Ala. 1994), a prospective employee argued that a "career opportunities announcement" was a binding offer of employment. This Court held, however, that the document was not intended to be construed as an offer of employment, but was "designed to be an informational tool, intended to advertise . . . employment vacancies and to give notice of the requirements that applicants for those vacancies must meet in order to be considered for employment." 642 So.2d at 972.
The Agency argues that the Manual does not meet theHoffman-La Roche requirement of specificity needed to create an actual offer of employment. The Agency points out the phrase in the introduction to the Manual that the trial court quoted: "Some items in this document are recommendations." It is important to note, however, that this sentence concludes: "and others are Agency and legal requirements."
The Agency argues that the Manual gives the Agency rights of discretion and modification that negate Graham's argument that the Manual constituted a binding offer of employment. For example, says the Agency, the Manual states 1) that the Agency "will continue to make policy changes as needed"; 2) that the Manual "represents a continuing effort and not an end"; and 3) that "no policy statement can cover every situation arising."
However, " '[u]nilateral contract modification . . . may be a repetitive process. Language in the handbook itself may reserve discretion to the employer in certain matters or reserve the right to amend or modify the handbook provisions.' " Hoffman-La Roche Inc. v. Campbell, 512 So.2d at 735, quoting with approval from Pine River State Bank v.Mettille, 333 N.W.2d 622, 627 (Minn. 1983). The ability to later modify handbook provisions does not justify a disregard of currently valid provisions.
Indeed, it appears that the Agency may have overlooked the Manual's requirement *Page 1220 
that, in the event the Agency does "make policy changes as needed," all employees (who have already been given copies of the Manual) must be given copies of revisions with specific instructions for removing out-of-date pages and inserting revised pages. The Manual further requires that each employee sign a statement acknowledging receipt of the Manual and its revisions and that the receipt be kept in the employee's personnel file. The Agency's ability to modify the Manual carries with it the responsibility to notify Agency personnel of the modifications. It is not reasonable to think that this procedure would be required if the Manual's provisions were mere general statements of policy.
The Agency points out the following provisions in the employee handbook in Campisi, supra, which were held to support a finding of "at will" employment: 1) that dismissal could be based on "[t]he violation of any rules and regulations contained herein, including but not limited to" certain described offenses; and 2) that "[t]here are other activities that can lead to termination." 611 So.2d at 299. The Agency argues that the provisions in Campisi are similar to the Manual's statements in paragraph 11.3 — that "[t]he specific type and degree of disciplinary action [are] to be determined by the nature of the offense," and that "one or more of the following actions may be taken and no order is established," — and that this similarity proves the generality of the Manual and brings it within the holding in Campisi.
However, Section XI, 11.3 ("Disciplinary Actions") — aportion of which is quoted by the Agency — is, when read in its entirety, found to be quite specific:
"11.3 DISCIPLINARY ACTIONS
 "The following types of disciplinary action will be utilized in enforcing Agency rules and standards of conduct, the specific type and degree of disciplinary action to be determined by the nature of the offense. In making judgments, one or more of the following actions may be taken and no order is established.
"11.3.1 CORRECTIVE INTERVIEW . . . .
"11.3.2 PROBATION . . . .
"11.3.3 SUSPENSION WITH PAY . . . .
"11.3.4 SUSPENSION WITHOUT PAY . . . .
"11.3.5 INVOLUNTARY TERMINATION (DISMISSAL) . . . .[4]
 "11.3.6 TERMINATION OF EMPLOYMENT (VOLUNTARY) . . . ."
These are the only provisions in the Manual that describe the possible type and degree of disciplinary action. Further, the fact that the disciplinary action is to be "determined by the nature of the offense" is an additional limitation and not a generality, as contended by the Agency. Section 11.3 presupposes the existence of an offense as the basis for discipline and specifically precludes discipline except for that "cause."
The Agency also maintains that its disciplinary policy is discretionary in nature. This argument is certainly contradicted by the portions of the Manual already noted — especially the guidelines for the "steps" in the grievance procedure prohibiting involuntary termination based on an "arbitrary, capricious, or discriminatory" decision.
These guidelines are clearly consistent with an important limitation on the authority of the executive director, who "retains the right to hire, evaluate staff performance, promote, transfer, assign, retain employees in positions, suspend, demote, discharge or take disciplinary action against employees if a just cause exists; [and] to relieve employees from duty because of a lack of work or for otherlegitimate reason." (Emphasis added.)[5] In addition to this requirement that *Page 1221 
employee terminations be based on good cause, there is the further requirement that a supervisor have just cause for recommending that an employee not be retained during his or her 90-day probationary period.
"Whether the language of [the Agency's Manual] is sufficiently clear and specific to constitute an offer of a unilateral contract is a question of law to be determined by the court." Dykes v. Lane Trucking, Inc., supra, 652 So.2d at 250. See, also, Campisi, supra; and Stinson, supra. However, on appeal, the ruling on a question of law carries no presumption of correctness, and this Court's review is de novo. Helms v.Helms' Kennels, Inc., 646 So.2d 1343 (Ala. 1994); First MercurySyndicate, Inc. v. Franklin County, 623 So.2d 1075 (Ala. 1993).
The Manual's provisions are devoid of disclaimers and, and when viewed in their entirety, are "sufficiently clear and specific to constitute an offer of a unilateral contract" of employment that can be accepted by an employee's retaining his or her employment after he or she "has become generally aware of the offer." Campisi, supra. The trial court erred in holding that the Agency's "Personnel Policies and Procedures Manual" did not constitute such an offer; the summary judgment was inappropriate on Graham's breach-of-contract claims.
We note that Judge Alex T. Howard, Jr., then Chief United States District Judge for the Southern District of Alabama, reached a similar conclusion in Lewis v. Dallas-Selma CommunityAction Agency, No. 90-0265 (July 28, 1991, S.D.Ala. 1991). In that case Mr. Lewis had been discharged by the Dallas-Selma Community Action Agency ("DSCAA") during his convalescence from a stroke, in spite of the fact that the DSCAA had been informed by Lewis's physician that "mentally, the plaintiff was 'as sharp as ever' and that the plaintiff 'would be able to perform any sort of desk job that does not require a great deal of physical activity,' " id., "Findings of Fact," ¶ 11, and in spite of the fact that the DSCAA had informed Lewis "that he would be allowed to remain on sick leave until August, 1989,"id., ¶ 12. Judge Howard held that the "complex myriad of specific provisions" in the DSCAA Personnel Policies and Procedures Manual "relative to the termination of an employee do in fact rise to the level of an offer [to create a binding unilateral contract under the rule of Hoffman-La Roche,supra]," id., "Conclusions of Law, Plaintiff's Claim in Contract," ¶ 3. The provisions that Judge Howard quoted from the DSCAA Manual make it appear that it was very similar to the Agency Manual before us; if anything, the procedures provided here are more specific in creating a binding contract of employment.
The judgment of the Court of Civil Appeals is reversed to the extent that it affirms the judgment for the defendants on the breach-of-contract claims. Graham did not seek certiorari review of that portion of the Court of Civil Appeals' judgment affirming the summary judgment as to the tort-of-outrage claim; therefore that judgment is affirmed insofar as it pertains to the outrage claim. The cause is remanded for further proceedings.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
HOOPER, C.J., and SHORES, HOUSTON, KENNEDY, and COOK, JJ., concur.
MADDOX and SEE, JJ., dissent.
[1] In her certiorari petition Graham did not challenge the affirmance as to the tort-of-outrage claim.
[2] Although the Manual's provisions use the terms "Agency" and "CCA" interchangeably to refer to the same entity, this opinion will use only the term "Agency."
[3] An additional fact in Abney was that, upon receipt of the employee handbook, employees of the Baptist Medical Centers signed an "acknowledgment" that stated, in part: "The policies in [the employee handbook] are not an expressed or implied contract of employment. I understand that my employment is terminable at will by me or by the employer."
[4] The text of 11.3.5, as noted above, provides that "[w]hen circumstances so warrant, an employee may be involuntarily terminated." The trial court quotes this provision in support of its holding that Graham is an "at-will" employee. However, the phrase "when circumstances so warrant" is analogous to a requirement of just cause for discipline and therefore contradicts the assertion that Agency personnel can be terminated without cause.
[5] In Toussaint v. Blue Cross Blue Shield, 408 Mich. 579,292 N.W.2d 880 (1980) (cited with approval in Hoffman-La Roche), the Michigan Supreme Court addressed the inclusion of "just cause" as a requirement for employee termination, holding:
 "While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. . . . It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation 'instinct with an obligation.' "
408 Mich. at 613, 292 N.W.2d at 892. Here, by requiring the executive director to act only with "just cause," the Agency has "created a situation instinct with an obligation."