The issue presented is whether certain statements and actions of the seller of *Page 622 
real property may constitute a guarantee relating to the use of that property for which damages for the breach thereof may be recovered by the buyer. We find that where the seller refused to sign a proposed contract that guaranteed to the buyer that he could build apartments on the land, but orally assured the buyer, prior to the sale, that all the restrictions had been removed and that there was nothing standing in his way, the seller created a guarantee, the consideration for which was the purchase price of the property.
Appellant E.R. Mayo originally bought a tract of land in Enterprise known as the First Addition to Indian Lakes Subdivision. When he bought the subdivision, it had been platted into lots for development purposes. Mayo subsequently drew, and recorded, a series of restrictive covenants applicable to all lots in the subdivision. The following was included:
"C. RESIDENTIAL AREA COVENANTS
 C1-1. LAND USE AND BUILDING TYPE. No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single-family dwelling not to exceed two and one-half stories in height and a private garage."
Several weeks afterward, Mayo decided the three particular lots made the basis of this case were best suited for use as apartments. Mayo filed an additional document which excepted
the subject lots from the restrictive covenants; this exception was recorded. Mayo then petitioned, and received, a change of zoning of the subject property by the City Zoning Commission to allow the land to be used for apartments, despite the objections of local residents.
Mayo then entered into negotiations with appellee Andress for the sale of the subject lots. Mayo, as seller, assisted Andress, as buyer, in having plans drawn and put Andress in touch with people who could arrange financing for the construction of apartments on the site. Buyer and seller met several times during the negotiations. Andress testified that he attempted to get a written guarantee from Mayo that apartments could be built on the property.[1] *Page 623 
The parties came to terms at a subsequent meeting and effected the conveyance by warranty deed. Included in the deed were the following provisions:
 "This deed is given subject to Restrictive Covenants on record in the Office of the Judge of Probate, Coffee County, Enterprise Division, Alabama, in Misc Book 22, Pages 518 and 582, and Misc. Book 22, Page 709, and subject to an Underground Utility Distribution Agreement, . . .
* * * * * *
 "And we do for ourselves and for our heirs, executors, and administrators covenant with the said GRANTEES, their heirs and assigns, that we are lawfully seized in fee simple of said premises; that they are free from all encumbrances, unless otherwise noted above; that we have a good right to sell and convey the same as aforesaid; that we will and our heirs, executors and administrators shall warrant and defend the same to the said GRANTEES, their heirs and assigns forever, against the lawful claims of all persons." (Emphasis added.)
After Andress obtained a building permit from the City of Enterprise, owners of land near the subject property sued to enjoin construction of the apartments. In that action, the court found that an owner of a property interest in the subdivision (the holder of an option to purchase a lot), had not agreed to the exception of the subject property from the restrictive covenants. The court found the exceptions to be a nullity. The court enjoined construction of the apartments. Andress then filed this suit for damages.
Andress alleged that the deed warranted that the subject lots were free of the encumbrance of the restrictive covenants, and further, that Mayo guaranteed to him that apartments could be built on the property. After hearing the testimony ore tenus, the court awarded Andress the difference between the purchase price and the value of the property if used for single family residential purposes, plus costs. The court found no fraud on the part of Mayo. Being dissatisfied with the judgment, Mayo appealed.
We hold that the trial judge did not err in awarding damages to Andress for breach of warranty. Although Mayo refused to sign the proposed written contract, containing many other terms besides that at issue here, there was evidence from which the judge could find that Mayo did expressly assure Andress he had nothing to worry about concerning the zoning, and that Andress could build apartments on the land.
We are mindful that Mayo testified it was never his intention to guarantee that apartments could be built on the subject property, but, in the absence of mistake, fraud or ambiguity, the existence velnon *Page 624 
of a contract, or as here, a promise made part of a contract, is determined by reference to the reasonable meaning of the parties' external and objective manifestations of mutual assent, rather than by their uncommunicated beliefs. Johnson v.Boggan, 56 Ala. App. 668, 672, 325 So.2d 178 (1975), Willistonon Contracts, 3d ed. § 22, 1536. And, it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such. Id. § 22A. A fact question was presented by credible evidence and resolved adversely to Mayo.
We recognize the rule, strenuously argued by appellant, that all prior negotiations are merged into the written contract, which purports to cover the entire transaction. Guilford v.Spartan Food Systems, Inc., 13 A.B.R. 1791, 1796, 372 So.2d 7
(Ala. 1979); Long v. Hirs, 270 Ala. 131, 116 So.2d 605 (1959); however, parol evidence is admissible to show the existence of other and additional valuable consideration received when such consideration is recited in the deed. Lipscomb v. Tucker,294 Ala. 246, 256, 314 So.2d 840 (1975).
Appellant argues that Andress was prevented from building apartments on the property because of governmental action. That is of no consequence here. The general rule is that, where the performance of a contract becomes impossible subsequent to its making, the promisor is not thereby discharged, but this rule has its exceptions, and these exceptions include the one where the performance becomes impossible by law, either by reason of a change in the law, or by some action or authority of the government. Hawkins v. First Federal Savings Loan Ass'n.,291 Ala. 257, 261, 280 So.2d 93 (1973); Greil Bros. Co. v. Mabson,179 Ala. 444, 450, 60 So. 876 (1912). Appellant claims he falls within the protection of this exception. We disagree. This case is distinguishable in that here the seller expressly warranted that the property could be used for the purpose of constructing apartments. The governmental action (court injunction against constructing apartments) could have resulted from the failure of the promisor to secure the consent of the holder of an option to consent to changing the restrictions. Consequently, the promisor could have foreseen that his failure to get the restrictive covenants changed could result in the very governmental action which resulted, thereby prohibiting the construction of the apartments. In other words, the promisor, under these circumstances, should have provided for that contingency. He did not.
Furthermore, in this case, there is some evidence that, apparent on the face of the deed, a warranty exists that the restrictive covenants had been changed to allow apartments to be built. The deed states that there were no encumbrances except as noted elsewhere in the instrument. The deed also states that the property is conveyed "subject to" the restrictive covenants and, by reference, the "exceptions" to the restrictive covenants. In this case, therefore, the trial court could apply the rule that where the language of a deed is ambiguous, the intent of the parties may be ascertained by reference to facts existing when the instrument was made, to which the parties may be presumed to have had reference. Lietzv. Pfuehler, 283 Ala. 282, 215 So.2d 723 (1968). Of course, if the language is plain and certain, acts and declarations of the parties cannot be resorted to, to aid construction. FinancialInvestment Corp. v. Tukabatchee Area Council, Inc., Boy Scoutsof America, 353 So.2d 1389 (Ala. 1977).
We have carefully examined the language of the deed referring to the restrictive covenants, and to the exceptions to those covenants,[2] and conclude that it is not plain and certain. The trial judge did not err, therefore, in considering acts and declarations of the parties to ascertain the extent *Page 625 
and nature of the warranty contained in the deed.
It is, of course, axiomatic that when the contract is ambiguous, parol evidence is admissible to ascertain the true intent of the parties. This is a fact question to be determined by the trial judge when sitting without a jury. Johnson-Rast Hays, Inc. v. Cole, 294 Ala. 32, 310 So.2d 885 (1975); andPritchett v. Wade, 261 Ala. 156, 73 So.2d 533 (1954).
The factual findings of the court have the effect of a jury's verdict — the resulting judgment grounded upon such findings are accorded, on appeal, a presumption of correctness which will not be disturbed unless plainly erroneous or manifestly unjust. Johnson-Rast Hays, Inc. v. Cole, 294 Ala. 32,310 So.2d 885 (1975); Kubiszyn v. Bradley, 292 Ala. 570,298 So.2d 9 (1974); Hayes v. Kennedy, 292 Ala. 362, 294 So.2d 739 (1974).
We are of the opinion that the judgment was not plainly erroneous or manifestly unjust; it is, therefore, affirmed.
AFFIRMED.
JONES, SHORES and BEATTY, JJ., concur.
TORBERT, C.J., concurs specially.
[1] The following is a portion of the testimony of the parties concerning the guarantee:
"Q. Did you have any —
 "A. I asked Mr. Mayo if there were any problems that we would face regarding covenants or zoning or anything and he told me that there had only been one objection to those apartments being built out there.
"Q. Who was that from?
 "A. Mr. Allen Hardt. And he said that has all been taken care of. He said Judge McAliley has had the covenants changed, the zoning has been changed by the City Commission and everything is clear. . . . Judge McAliley has taken care of everything and all you have to do and I quote, `All you have to do is go down to the city hall buy a building permit and start pouring concrete.'
"Q. All right, did you rely on that representation?
"A. I did.
 "Q. Prior to you purchasing the lots how many times did Mr. Mayo make those assurances to you?
 "A. Numerous occasions. It could have been three, five or seven times. I don't recall.
 "Q. Larry were the things regarding the zoning and restrictive covenants, were they ever consummated into an agreement between you and Mr. Mayo?
 "A. They were written up in an agreement that your office prepared for us, but it was never signed.
"Q. Did Mr. Mayo refuse to sign it?
 "A. Mr. Mayo put his arm around my shoulder in your office and said, `Now, we are both Christian men, there is no need to worry about this, Judge McAliley has taken care of it.' and I quote, `I guarantee.' He used that exact phrase. Said everything is all right, there is no need to worry about it. All you have got to do is go out and start building apartments.
"Q. He made that statement to you orally?
"A. He made that statement to me in your office.
"Q. But would he sign the agreement?
"A. No, sir.
* * * * * *
Mayo testified he refused to sign an agreement:
 "Q. After you all discussed, the price was discussed and what have you, as you testified about this morning and I won't go back over that, but were you ever prooffered [sic] a proposed contract between you and the buyer, Mr. Andress?
"A. Yes, they prepared a contract.
"Q. When did you become aware of that?
"A. Of the contract itself?
"Q. Yes, who told you about it?
"A. Mr. Andress told me about it.
"Q. What did he say to you?
 "A. He said that they had prepared a contract, he was putting out money and of course in putting up money he wanted the assurety that the property would be his. I had no objection to that point of it. So, therefore, I went with him down to Mr. Dale Marsh's office. I looked over the contract. There were no objectionable things in it. One of them was the fact that the zoning, it was worded in a way that if I signed it I would be guaranteeing that he could build those regardless, I had already in a previous time made the statement that everything as far as I knew was done right, but I would not guarantee it for one day. I did not know what could happen in the future. I had no control over this. So, therefore, I could not sign it on those basis [sic]. Another basis was the fact that it was assuring him of permanent financing of the apartments and to do that would have been subtracting a part of the package deal. In other words, if he could not get financing on that portion, then he could have went ahead and bought the acreage and left off the lots and I was opposed to that.
"Q. And did you so advise him?
"A. Yes, sir.
"Q. Did you so advise his attorney?
 "A. Yes, sir. Now, to the best of my knowledge that is correct.
[2] The deed specifically refers to the document which exempted these lots as being filed in "Misc. Book 22, page 709."