72 So.3d 37 (2011)
MOBILE ATTIC, INC., and Mobile Attic Franchising, Inc.
v.
KIDDIN' AROUND OF ALABAMA, INC., d/b/a Real People, et al.
2090735.
Court of Civil Appeals of Alabama.
April 29, 2011.
*39 Michael L. Douglas of Friedman, Leak, Dazzio, Zulanas & Bowling, P.C., Birmingham, for appellant.
A. Courtney Crowder and Robert G. Upchurch of Phelps, Jenkins, Gibson & Fowler, L.L.P., Tuscaloosa, for appellee TotalCom, Inc.; Robert D. Norman, Jr., Birmingham, for appellees Kiddin' Around of Alabama, Inc., People Store, Inc., and Houghton Talent, Inc.
THOMAS, Judge.
In early 2005, Mobile Attic, Inc., and Mobile Attic Franchising, Inc. (referred to collectively as "MA"), which rent portable storage facilities, were considering what direction to take their advertising. Specifically, MA desired to have professional television commercials produced to offer to franchisees as a method of assisting the franchisees in developing and furthering MA's business. To that end, MA began discussions with an advertising agency, TotalCom, Inc. ("TC"). Most of the discussions regarding the commercials were between Betsy Harris, the marketing director for MA, and Jimmy Warren, the president of TC.
In March 2005, MA's discussions with TC yielded a proposal encompassing the production of a set of three television commercials. TC presented MA with a written proposal containing estimates from three production companies. The written proposal indicated that the estimates included *40 "all anticipated costs for television production: concepts, story boards, writing, models, props, sets, shooting, production, site expenses, and editing." After considering the estimates, MA selected one of the three companies, Dill Productions ("DP"), to produce a set of three television commercials. Harris e-mailed Warren on September 26, 2005, and gave Warren permission to begin production of the commercials with DP as the production company. At no point did MA and TC or MA and DP enter into a written contract containing detailed terms relating to the production of the television commercials.
DP produced the commercials, and TC billed MA for the commercials, which cost a total of $196,000, in October 2005 and November 2005; MA paid both invoices. Neither invoice contained a breakdown of the costs being charged by DP. The commercials were made available for MA's use in February or March 2006.
On March 16, 2007, approximately a year after MA first started airing the commercials, Warren contacted Harris by e-mail, requesting that MA pay the talent-renewal fees for the professional actors used in the commercials.[1] Harris did not immediately respond to Warren; she first forwarded the e-mail to Josh Wilson, who served as the chief financial officer of Mobile Attic Franchising and the secretary/treasurer of Mobile Attic. In her e-mail to Wilson, Harris stated: "[T]his is the first I've heard of [the talent-renewal fees]" and "I think I would have remembered this because it was VERY important to me that there be no attachment to the talent or the agency with our commercials." (capitalization in original.)
Neither Harris nor Wilson responded to Warren's e-mail, and Warren again contacted Harris by e-mail on April 7, 2007, stating that TC was being pressured by a talent company to pay the talent-renewal fees that had become due. Harris responded to Warren by an e-mail sent on April 9, 2007, in which she stated that she was forwarding Warren's e-mail to Wilson; she also stated in her response that she "[did] not recall any conversations that we've had about ongoing talent fees." In response to Harris's e-mail communicating her lack of memory about the talent-renewal fees, Warren sent another e-mail to Harris on April 10, 2007, stating that he recalled discussing the talent-renewal fees when discussing the production budgets and other costs with Harris in her office. Harris forwarded the April 10, 2007, e-mail to Wilson and copied Warren, stating in her message that she did not remember discussing talent-renewal fees, that such fees would have sent up a red flag for her, and that no paperwork had been located regarding the television commercials. Harris also asked Wilson if he recalled anything from the meetings with Warren and requested that Wilson ask Pete Cash, the president of MA, if he recalled a discussion about talent-renewal fees.
Warren e-mailed Harris a second time on April 10, 2007, apologizing that Harris did not recall the discussion of the talent-renewal fees. He stated that the fees were "standard and required procedure when using professional talent." Harris responded to Warren by e-mail again that same day, stating:

*41 "I would not have known that it is standard and required procedure to pay annual talent fees for professional talent. I had never used professional talent and you had never provided me with a breakdown of our costs, or ongoing fees. If I had known there were fees or other costs attached, I would have used [MA employees] or different talent, as that is what I had done in the past with great success. The only amount that I recall is for the total production of the three commercials. I have asked the others in the office who were involved in our meetings and none of us remember any conversation regarding ongoing talent fees. We have no documentation anywhere of this."
Warren responded to Harris's second April 10, 2007, e-mail, stating:
"I'm sorry if my note implied that you should have known about the talent renewals. I would not expect you to know other than our discussion about it. I feel very badly about the misunderstanding....
"Bill [Branch, another TC employee,] and I remember discussing it, but I truly regret that apparently we did not make it clear."
In the closing paragraph of his e-mail, Warren offered to have TC pay one-half of the talent-renewal fees for the year "because apparently we contributed to the misunderstanding." Ultimately, TC paid all the talent-renewal fees for the year running from March 2007 to March 2008. In July 2007, TC resigned from further representation of MA. In its resignation letter to MA, Warren stated that TC would accept no further responsibility for future talent-renewal fees.
At some point in the spring of 2008, Kiddin' Around of Alabama, Inc., d/b/a Real People ("RP"), the talent company that provided the professional actors used in MA's commercials, contacted MA directly regarding the talent-renewal fees for the year running from March 2008 to March 2009. MA apparently did not respond to RP, and RP's Treasurer, W.G. Henry, sent a letter, dated June 4, 2008, to MA demanding payment of the talent-renewal fees within 10 days. When MA did not pay the talent-renewal fees, RP engaged Robert D. Norman to send a demand letter to MA. Norman's letter, dated June 13, 2008, demanded payment of $10,500 in talent-renewal fees by June 20, 2008. Norman's letter also threatened legal action against MA if the payment was not made.
On July 2, 2008, MA filed an action seeking declaratory relief against TC and RP and asserting a fraudulent-suppression claim against TC. Specifically, MA alleged that it had received proposals to produce television commercials from TC, that MA had selected DP to produce the commercials based on TC's proposal, that MA had never seen DP's estimate to TC, that either TC or DP had contracted with RP for RP to provide the actors for the commercials, that MA had never been informed of the talent-renewal fees until Warren e-mailed Harris in March 2007, and that MA had never had any communications with RP until RP demanded that MA pay the talent-renewal fees in June 2008. MA requested that the trial court declare that MA was not responsible for the talent-renewal fees and that, if RP was owed any talent-renewal fees, TC was the party responsible for their payment. MA sought a jury trial on the fraudulent-suppression claim against TC.
TC answered MA's complaint on August 13, 2008; RP filed a "response" to the complaint on August 25, 2008. On September 9, 2008, People Store, Inc. ("PS"), and Houghton Talent, Inc. ("HT"), two other talent companies with which RP had *42 contracted, moved to intervene in the action and sought a temporary restraining order ("TRO"); on October 9, 2008, the parties agreed to allow PS and HT to intervene in the action, and PS and HT withdrew their request for a TRO. In September 2009, RP, PS, and HT (collectively referred to as "the talent companies") asserted what they entitled a "conditional counterclaim," in which they sought $21,000 in talent-renewal fees from MA if MA were unsuccessful in its declaratory-judgment action.
Trial on the declaratory-judgment claim was held on November 23, 2009; a separate trial on the fraudulent-suppression claim was set for a later date. After the conclusion of the November 23, 2009, trial, the trial court entered an order on December 10, 2009, declaring that
"(1) The Plaintiff, [MA,] is responsible for the payment to the Defendants of renewal of talent fees for services rendered by [the talent companies].
"(2) As to the counterclaim, a Judgment is entered for the counterclaimants, [the talent companies,] in the amount of Twenty One Thousand Dollars ($21,000.00).
"(3) A Status Conference is set on January 6, 2010, at 8:30 a.m. as to the fraud claim by [MA] against [TC]."
On December 31, 2009, MA sought an extension of the time to file what it considered to be a postjudgment motion pursuant to Rule 59, Ala. R. Civ. P., which the trial court purported to grant.[2] However, because the fraudulent-suppression claim remained outstanding, the December 10, 2009, order was not a final judgment capable of supporting an appeal, and any motion seeking reconsideration of that judgment would not have been a postjudgment motion under Rule 59. See Malone v. Gainey, 726 So.2d 725, 725 n. 2 (Ala.Civ. App.1999) ("[A] Rule 59 motion may be made only in reference to a final judgment or order."). MA sought a second "extension" on February 3, 2010, which the trial court also purported to grant. On March 5, 2010, MA ultimately filed a motion, purportedly pursuant to Rule 59, seeking reconsideration of the trial court's December 10, 2009, order. The trial court denied that motion on March 29, 2010, and MA filed its notice of appeal of the December 10, 2009, order on May 10, 2010.
Because the December 10, 2009, order was not a final judgment, this court remanded the cause to the trial court for it to "determine whether to enter a Rule 54(b), Ala. R. Civ. P., certification as to the December [10], 2009, order." The trial court certified the order as a final judgment on February 24, 2011.
"The trial court's judgment followed a bench trial, at which the court heard ore tenus evidence. `"When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error."' Smith v. Muchia, 854 So.2d 85, 92 (Ala.2003) (quoting Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala. 1996)).
"`"The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses." Hall v. *43 Mazzone, 486 So.2d 408, 410 (Ala. 1986). The rule applies to "disputed issues of fact," whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala.1995). The ore tenus standard of review provides:
"`"[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court's conclusion on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence."'"
Yeager v. Lucy, 998 So.2d 460, 462-63 (Ala.2008) (quoting Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala.2000) (quoting in turn Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977))).
The testimony at trial was provided by Wilson, Warren, and Henry. The deposition testimony of Harris was introduced as a trial exhibit and read into the record. By and large, the testimony of Warren and Harris mirrored their statements in their respective e-mails, quoted above, which were admitted as evidence at trial. Henry's testimony was irrelevant to the question whether MA and TC had entered into a contract containing any terms regarding the payment of talent-renewal fees.
Warren testified that he recalled discussing the talent-renewal fees with Harris in her office at one of the several meetings the two had had between March 2005 and September 2005 as they discussed production and other costs for the commercials MA desired to be made. Specifically, Warren said that he recalled telling Harris that using professional talent in the commercials would necessitate the payment of "residuals" in subsequent years if the commercials were used. Warren also said he explained to Harris that the talent-renewal fees would need to be paid each year the commercials were used after the first year and that they were an industry standard. Warren admitted that he did not assign a particular amount to the talent-renewal fees because, he said, they were "a moving target" because they were based on the markets in which the commercials were aired. According to Warren, he had assumed that Harris understood his explanation of the talent-renewal fees because she had asked no questions during the discussion and because she had portrayed herself as knowledgeable about and experienced in marketing and advertising. Warren admitted that Harris had not specifically responded to him when he mentioned the talent-renewal fees.
Harris denied any memory of a discussion regarding any ongoing costs like the talent-renewal fees. She further testified that she did not recall the details of any meeting other than a story-board meeting. However, she testified that she would not have agreed to such fees and that she specifically recalled telling Bill Branch, another TC employee, that she did not want "web fees" associated with the commercial because she wanted to be able to use the commercial when and where she chose. According to Harris, she had had an issue regarding "web fees" arise with another "piece" that Cash had done that had featured Terry Bradshaw as a narrator. Harris said any mention of talent-renewal fees or ongoing fees would have sent up a "red flag" for her because of that other experience. She further testified that she had informed TC that she did not want any strings attached to the commercials and that she intended to use them for three to five years.
*44 Wilson testified that Harris had had the most contact with TC regarding MA's advertising and marketing plans. Although he and Cash had attended a few of the meetings and although both had to approve of the expenditure for the commercials, Wilson said that Harris was responsible for advertising for MA. According to Wilson, his understanding of the proposal from TC was that the estimates from the production companies covered "total costs" for the commercials. He said that the use of the word "models" in the proposal indicated to him that the estimates from the production companies included the cost of the actors used in the commercials. Wilson testified that he would not have agreed to purchase the commercials had he known that MA would be obligated to pay talent-renewal fees because those fees seemed to him to be "open ended." He explained that he would have had no way of predicting the total costs of the commercials over a three- to five-year period if MA were required to pay talent-renewal fees. Wilson also testified that Harris had had an issue with fees arise over the "piece" Cash had done involving Terry Bradshaw; according to Wilson, the issue with that "piece" arose in late 2005 or early 2006, which would have been after the discussions she had had with Warren between March 2005 and September 2005. Wilson admitted that MA continued to use the commercials even after it learned of the talent-renewal fees and even after RP contacted MA regarding the delinquent fees in 2008.
On appeal, MA makes two arguments for reversal. MA first argues that the Statute of Frauds, codified at Ala.Code 1975, § 8-9-2, bars recovery of the talent-renewal fees under the oral contract between MA and TC because the contract was one that could not be performed within one year. Secondly, MA argues that TC failed to prove mutual assent to the alleged oral contract regarding the talent-renewal fees. We will address MA's second argument first.
MA argues that TC failed to prove mutual assent to the contract between the two companies because it could not prove a "meeting of the minds" regarding the talent-renewal fees. As MA correctly points out, a "meeting of the minds" or a mutual assent to the terms of a contract is necessary to the formation of a contract. See Lilley v. Gonzales, 417 So.2d 161, 163 (Ala.1982). According to MA, Harris's silence at the time the talent-renewal fees were allegedly discussed was not sufficient to relay consent to that particular term of the oral contract. MA relies on Denson v. Kirkpatrick Drilling Co., 225 Ala. 473, 144 So. 86 (1932), as support for the proposition that silence cannot be construed as assent.
However, MA has taken a simplistic view of the discussion of mutual assent in Denson, in which our supreme court began by explaining the general rule that, unless a contract is required by law to be in writing and signed by the parties, an offeree need not sign the contract to evince his or her mutual assent to it. Denson, 225 Ala. at 479, 144 So. at 91. The court then cautioned that "`such an acceptance, however, to become effective as a binding contract must be positive and unambiguous.'" Id. (quoting Stephenson Brick Co. v. Bessemer Eng'g & Constr. Co., 218 Ala. 325, 326, 118 So. 570, 571 (1928), and citing 1 Williston on Contracts, pp. 127, 168, §§ 72, 90). In the context of that discussion, the court noted that "[t]his statement of the general rule precludes acceptance by mere silence and inaction, as `generally speaking an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the *45 offer.'" Id. (quoting 1 Williston on Contracts, p. 168, § 91).
However, even if "mere silence" cannot be considered an assent to an offer, this case does not involve "mere silence." "`It is well settled that whether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external and objective actions.'" Cook's Pest Control, Inc. v. Rebar, 852 So.2d 730, 738 (Ala.2002) (quoting SGB Constr. Servs., Inc. v. Ray Sumlin Constr. Co., 644 So.2d 892, 895 (Ala.1994)). Neither the uncommunicated beliefs of a party nor any misunderstandings regarding the import of particular terms prevent an objective manifestation of intent from being effective. Lilley, 417 So.2d at 163; Mayo v. Andress, 373 So.2d 620, 624 (Ala.1979); and Johnson v. Boggan, 325 So.2d 178, 182, 56 Ala.App. 668, 672 (Ala.Civ.App. 1975).
Based on Warren's testimony, the talent-renewal fees were part of the discussion about the production and other costs of the television commercials that MA desired TC to develop. "[A] contract may consist of several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire contract." Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297, 304 (Ala.1986). Thus, the written proposal submitted by TC, the e-mails between the parties regarding the selection of DP as the production company, and the oral discussions between Warren and Harris reflected the agreement between MA and TC relating to the television commercials. Likewise, the actions of the parties in reference to the contract can form the basis of mutual assent; that is, when the conduct of one party is such that the other party may reasonably draw the inference of assent to the agreement, that conduct is effective as assent. See Deeco, Inc. v. 3-M Co., 435 So.2d 1260, 1262 (Ala.1983); Mayo, 373 So.2d at 624. Harris's authorization of the production of the commercials, MA's participation in that process, MA's payment of the invoices submitted by TC, MA's acceptance of the finished commercials, and MA's use of the finished commercials all formed the basis of MA's assent to the contract with TC. We cannot agree with MA that Harris's reported silence when Warren mentioned talent-renewal fees during preproduction discussions prevented mutual assent to the terms of the contract in light of the other actions of Harris and MA that conveyed agreement to the terms of the contract regarding the production of the commercials.
The dissent disagrees with our conclusion that the actions of MA in going forward with the making of the commercials can evidence mutual assent in these circumstances because, the dissent says, TC's actions in failing to list talent-renewal fees in the proposal and in indicating that the second invoice was for the "final" payment for the production costs relating to the commercials prevents the actions of the parties from evidencing mutual assent. Although the proposal and the invoices do not indicate that talent-renewal fees were included in the cost of producing the commercials, that fact comports with the explanation of how those fees work. The first year's fees for the cost of the talent used in the commercials are included in the production costs. Talent-renewal fees that could accrue for the years the commercial might be used after the first year cannot be calculated at the time of production; that those fees would even be due is purely speculative at the time of the production of the commercial. In addition, the talent-renewal fees are not payable to the production company but instead must be paid to the talent companies, whether *46 directly or indirectly. Thus, we disagree that the actions of TC in making the proposal and in invoicing MA for the production costs of the commercials undercut our conclusion that mutual assent was manifested by MA's actions in proceeding to have the commercials produced and in accepting and using the finished commercials.
Before we turn to MA's argument that the oral contract between it and TC is void under the Statute of Frauds, we must consider whether the Statute of Frauds defense was raised below or was waived by MA's failure to plead that affirmative defense in its complaint or another pleading. TC and the talent companies argue on appeal that MA waived the Statute of Frauds defense by not raising it in its complaint or in response to the counterclaim. Hughes v. Wallace, 429 So.2d 981, 983 (Ala.1983) ("Under Rule 8(c), Alabama Rules of Civil Procedure, the statute of frauds is an affirmative defense which must be specially pleaded.... [F]ailure to do so constitutes a waiver of that defense."). According to TC and the talent companies, MA first raised the defense in counsel's closing argument, at which point, say TC and the talent companies, they objected. However, based on our review of the transcript, it appears that MA raised the theory as a basis for a judgment in its favor in counsel's opening statement to the trial court and that none of the appellees objected at that time. Thus, we must consider whether the issue was tried by the implied consent of the parties under Rule 15(b), Ala. R. Civ. P., which provides, in pertinent part, as follows:
"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."
As this court has explained,
"[t]he typical Rule 15(b) case involves a situation in which a party, at trial and without objection from an opposing party, presents evidence that gives rise to an issue that was not pleaded. It has been consistently held that when issues that have not been raised in the pleadings are tried by the express or implied consent of the parties, those issues are treated in all respects as if they had been raised in the pleadings."
Tounzen v. Southern United Fire Ins. Co., 701 So.2d 1148, 1150 (Ala.Civ.App.1997).
The evidence at trial clearly established that the contract at issue was an oral contract, and MA's reliance on the Statute of Frauds defense was placed squarely before the trial court at the start of the trial. See Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892, 896 (Ala. 1995) ("It is well settled law in Alabama that implied consent of the parties can be found when an opposing party fails to object to the introduction of evidence raising the disputed issue initially."); see also 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1278 (3d ed. 2004) ("Even as late as trial, if evidence relating to an unpleaded affirmative defense is introduced without objection, Rule 15(b) requires the pleadings to be treated as if they actually had raised the defensive issue."); see also Robinson v. Morse, 352 So.2d 1355, 1357 (Ala.1977). Therefore, we conclude that the Statute of Frauds defense was asserted by MA at trial without timely objection and that it was tried by the implied consent of the parties. Towner, 663 So.2d at 896. We *47 will therefore consider MA's Statute of Frauds argument.
The Statute of Frauds requires certain agreements to be in writing to be enforceable. The statute reads, in relevant part:
"In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
"(1) Every agreement which, by its terms, is not to be performed within one year from the making thereof."
§ 8-9-2.
MA argues that the agreement to pay talent-renewal fees was not enforceable under the Statute of Frauds because the fees would not have come due and payable until early 2007, more than one year after the alleged oral contract was made, which the parties agree was no later than September 2005. Thus, MA contends, the agreement to pay the talent-renewal fees could not have been performed within one year.
We need not decide, however, whether the oral contract between MA and TC is barred under subsection (1) of § 8-9-2, because, as the appellees point out, the Statute of Frauds applies only to executory contracts and not to executed ones. Ex parte Ramsay, 829 So.2d 146, 155 (Ala. 2002). Although MA argues that the oral contract between it and TC remains executory, we cannot agree.
"A contract is executory if neither party has fully performed his obligation to the other party.... A contract is executed, and not voided by the Statute of Frauds, if [one party] has fully performed his obligation to the [other party] and sues the [other party] to obtain [that party's] performance or the completion of [that party's] performance."
Ex parte Ramsay, 829 So.2d at 155. As our supreme court has explained, a contract is not executory when "[n]othing remains to be done except to pay the money." Scott v. Southern Coach & Body Co., 280 Ala. 670, 673, 197 So.2d 775, 777 (1967). The evidence is undisputed that TC and the talent companies all performed any obligations they may have had under the oral contract between MA and TC or any agreements stemming from that contract. The only remaining performance under the oral contract was MA's payment of the talent-renewal fees when or if such payment became due. We conclude, then, that the oral contract between MA and TC is an executed contract not barred by the Statute of Frauds.
In conclusion, we have determined that the trial court had before it sufficient evidence to find mutual assent between MA and TC regarding the terms of their oral contract, including the requirement that MA pay talent-renewal fees. Thus, an oral contract was formed between MA and TC regarding the production of and payment for the television commercials. We have also determined that the oral contract between MA and TC is an executed and not an executory contract, and, as a result, that the Statute of Frauds would not void that oral contract. Based on these determinations, we conclude that the judgment declaring that MA was responsible for the payment of the talent-renewal fees and awarding the talent companies $21,000 on their counterclaim seeking payment of those fees is due to be affirmed.
AFFIRMED.
THOMPSON, P.J., concurs.
MOORE, J., concurs in the result, without writing.
*48 BRYAN, J., dissents, with writing.
PITTMAN, J., recuses himself.
BRYAN, Judge, dissenting.

Undisputed Facts
The following facts are undisputed. In 2005, Mobile Attic, Inc., and Mobile Attic Franchising, Inc. (collectively "MA"), which rent portable storage facilities, began discussing with TotalCom, Inc. ("TC"), an advertising agency, the possibility of having professional television commercials produced for MA. MA was represented in those discussions by Betsy Harris, the marketing director for MA; TC was represented in those discussions by Jimmy Warren, TC's president. Following the initial discussions between Harris and Warren, Warren, in March 2005, sent Harris a written proposal containing estimates from three production companies of the cost for producing a set of three commercials for MA. TC's written proposal stated that those "[e]stimates include all anticipated costs for television production: concepts, story boards, writing, models, props, sets, shooting, production, site expenses, and editing." (Emphasis added.) After considering the estimates, MA selected Dill Productions ("Dill") as the production company to produce the commercials, and Harris, on September 26, 2005, sent Warren an e-mail telling him to proceed with the production of the commercials using Dill as the production company. TC and MA did not prepare and sign a written contract memorializing the terms of their agreement. TC subsequently sent MA an invoice dated October 6, 2005, billing MA for "½ of production costs to produce" the three commercials and an invoice dated November 11, 2005, billing MA for the "[f]inal ½ of production costs to produce" the three commercials. MA paid TC's October 6, 2005, and November 11, 2005, invoices in full. On March 16, 2007, approximately a year after MA first started airing the commercials, Warren sent Harris an e-mail requesting that MA pay talent-renewal fees for the professional actors used in the commercials.[3] MA did not pay the talent-renewal fees.

Procedural History
MA sued TC and one of the talent agencies claiming the talent-renewal fees, seeking a judgment declaring that it was not obligated to pay the talent-renewal fees and that, if any talent-renewal fees were owed, they were owed by TC. MA also stated a claim of fraudulent suppression against TC and sought a jury trial with respect to that claim. Two other talent agencies claiming talent-renewal fees intervened. Subsequently, all three talent agencies asserted counterclaims against MA, seeking $21,000 in talent-renewal fees. The trial court ordered a separate jury trial for MA's fraudulent-suppression claim and held a bench trial regarding MA's claim seeking a declaratory judgment and the talent agencies' counterclaims seeking $21,000 in talent-renewal fees. Following the bench trial, the trial court entered a judgment declaring that MA was obligated to pay the talent-renewal fees and awarding the talent agencies $21,000 in talent-renewal fees. The trial court did not make any express findings of fact.
MA then appealed. Because the trial court's judgment did not dispose of MA's fraudulent-suppression claim and the trial court had not certified the judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P., we reinvested the trial court *49 with jurisdiction to determine whether to certify the judgment as a final judgment pursuant to Rule 54(b), and the trial court eventually certified it as a final judgment pursuant to Rule 54(b).

Disputed Evidence
Warren testified that, in a meeting after he sent Harris the written proposal in March 2005 and before Harris sent him her September 26, 2005, e-mail telling him to proceed with the production of the commercials, he told Harris that MA would be responsible for paying talent-renewal fees and that Harris made no response. Harris testified that she had no recollection of Warren ever mentioning that MA would be responsible for paying talent-renewal fees before she received his March 16, 2007, e-mail asking TC to pay the talent-renewal fees and that she would not have agreed to the production of the commercials if she had heard Warren say that MA would be responsible for paying the talent-renewal fees.

Analysis
MA argues, among other things, that the trial court erred in declaring that MA is obligated to pay the talent-renewal fees because, MA says, there was no mutual assent by MA and TC that MA would be responsible for the talent-renewal fees. I agree. Because TC and MA did not prepare and sign a written contract memorializing the terms of their agreement, we must determine whether they mutually assented that MA would be obligated to pay the talent-renewal fees on the basis of their conduct. See Lilley v. Gonzales, 417 So.2d 161, 163 (Ala.1982).
The written proposal TC sent MA in March 2005 expressly stated that the "[e]stimates include all anticipated costs for television production: concepts, story boards, writing, models, props, sets, shooting, production, site expenses, and editing." (Emphasis added.) There was no mention of talent-renewal fees in the proposal. Moreover, the October 6, 2005, invoice TC sent MA billed MA for "½ of production costs to produce" the three commercials and the November 11, 2005, invoice TC sent MA billed MA for the "[f]inal ½ of production costs to produce" the three commercials. It is undisputed that MA paid both those invoices in full. Neither of those invoices referred to any future amounts MA would owe, and, indeed, the November 11, 2005, invoice stated that it represented the "final" half of the costs to produce the commercials, which indicated that MA would not owe any further amount. Although Warren testified that he mentioned to Harris that MA would be obligated to pay talent-renewal fees in a meeting after sending her the written proposal and before she told him to proceed with the production of the commercials, he admitted that she made no response to that statement. Moreover, subsequent to Warren's allegedly mentioning to Harris that MA would be obligated to pay the talent-renewal fees, TC sent MA written invoices indicating that the invoices, together, represented the full amount MA would owe for the production of the commercials.
The conduct of TC in sending MA the October 6, 2005, and November 11, 2005, invoices, the conduct of TC in stating in the November 11, 2005, invoice that it represented the "final" half of the production costs, and MA's conduct in paying the October 6, 2005, and November 11, 2005, invoices in full indicates that the parties agreed that the October 6, 2005, invoice and the November 11, 2005, invoice together represented the full amount that MA had agreed to pay. Thus, even if the trial court found that Warren had told Harris that MA would be responsible for paying talent-renewal fees, the subsequent conduct of the parties indicates that there was *50 no mutual assent to that putative term of the contract. Consequently, because the trial court's error in holding that MA was responsible for paying the talent-renewal fees was an error in applying the law to the facts, the ore tenus rule does not cloak that holding with a presumption of correctness. See Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007) ("`[T]he ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts.'" (quoting Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005))).
The main opinion asserts that it is reasonable that the invoices would not account for talent-renewal fees because, the main opinion says, (1) the talent-renewal fees would not become payable unless the commercials were aired for more than one year; (2) when the commercials were produced, it was speculative whether the commercials would be aired for more than one year; and (3) the talent agencies were the parties who would ultimately be entitled to the talent-renewal fees. Those three factors might explain why TC did not include a provision obligating MA to pay the talent-renewal fees in the parties' contract, but they do not support the conclusion that the parties mutually assented to the inclusion of such a provision in their contract.
Accordingly, because there was no conduct by the parties evidencing their mutual assent to the inclusion in their contract of a provision obligating MA to pay the talent-renewal fees, I would (1) hold that the trial court erred in holding that MA was obligated to pay talent-renewal fees over and above the total amount billed to it in the October 6, 2005, and November 11, 2005, invoices, (2) reverse the judgment of the trial court, and (3) remand the cause with instructions for the trial court to enter a judgment in favor of MA. Therefore, I respectfully dissent.[4]
NOTES
[1] According to the evidence at trial, talent-renewal fees are used to compensate the actors appearing in particular commercials because the actors are precluded from appearing in other commercials during the time and in the markets that the particular commercials are being run. The fees vary based on the geographic regions in which television commercials are aired and can apparently be paid either yearly or quarterly to either the talent company or the advertising agency, which then pays the talent company.
[2] We note that such an extension is not permitted under the Rules of Civil Procedure. See Rule 6(b), Ala. R. Civ. P. (permitting the trial court to enlarge the time within which to perform an act under the rules except the time to take any action under certain rules, including Rule 59(b), (d), and (e)).
[3] The record indicates that talent agencies charge "talent-renewal fees" for actors who appear in a commercial because the actors cannot appear in other commercials in the markets where the first commercial is airing until the first commercial ceases airing.
[4] Nothing herein should be interpreted as expressing an opinion regarding whether the talent agencies may recover the talent-renewal fees from TC.